**IN THE UNITED STATES DISTRICT COURT\
FOR THE WESTERN DISTRICT OF TEXAS\
EL PASO DIVISION**

| | | |
|---|---|---|
| **EL PASO HEALTHCARE SYSTEM,** | § | |
| **LTD,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **EP-09-CV-54-KC** |
| | § | |
| **MOLINA HEALTHCARE OF NEW** | § | |
| **MEXICO, INC.,** | § | |
| | § | |
| **Defendant**. | § | |

## ORDER CONCERNING MOTIONS FOR SUMMARY JUDGMENT

On this day, the Court considered Plaintiff El Paso Healthcare System's Motion for Partial Summary Judgment ("EPH Mot.") (Doc No. 40) and Defendant Molina Healthcare's Motion for Summary Judgement ("Molina Mot.") (Doc. No. 42). For the reasons set forth herein, El Paso Healthcare System's Motion is **DENIED** and Molina Heathcare's Motion is **GRANTED** in part and **DENIED** in part.

## I.    BACKGROUND

### A.    Procedural Posture

El Paso Healthcare System, Ltd. ("EPH"), which owns Las Palmas Medical Center and Del Sol Medical Center – two hospitals in El Paso, Texas (the "Hospitals") – is suing Molina Healthcare of New Mexico ("Molina"), an insurance company which provides managed care organization ("MCO") health coverage to certain New Mexico Medicaid beneficiaries. *See* Notice of Removal (Doc. No. 1) 1-2; *see also generally* N.M. ADMIN. CODE §§ 8.301.5, 8.305.1-4 (implementing a policy of shifting Medicaid beneficiaries from a directly-state-paid fee-for-service system to privately-run managed care programs which receive predetermined capitation premiums from the state for each enrollee). Pending before the Court are cross motions for summary judgment. *See* EPH Mot.; *see also* Molina Mot. Each side has filed a Response to the opposing Motion. *See* Def.'s Resp. to Pl.'s Mot. ("Molina Resp.") (Doc. No. 44); *see also* Pl.'s Resp. to Def.'s Mot. ("EPH Resp.") (Doc. No. 46). Each side has also filed a Reply in support of its own Motion. *See* Pl.s Reply to Def.'s Resp. ("EPH Reply") (Doc. No. 47); *see also* Def.'s Reply to Pl.'s Resp. ("Molina Reply") (Doc. No. 49). To the extent discussed below, the Court denies EPH's Motion and grants in part and denies in part Molina's Motion.

### B.    Facts

At the center of this suit is EPH's claim that, since at least 2006, Molina has underpaid (and continues to underpay) it for certain services rendered at the Hospitals to Molina-covered New Mexico Medicaid beneficiaries. *See* Notice of Removal 1-2; *see also* Pl.'s Orig. Pet. (Doc. No. 1 Ex. A) ¶ 9. At this point in the litigation, a number of issues have been privately resolved, and the dispute now boils down to a single subject – alleged underpayments for emergency

outpatient services.  *See* EPH Mot. 1 ("Plaintiff respectfully requests that the Court determine . . .

the application of a New Mexico [] regulation setting the Medicaid reimbursement rate for

outpatient hospital services."); *see also* Molina Resp. 1 ("The parties have effectively resolved all

disputes regarding the reimbursement of inpatient hospital services.").  In connection with this

single disputed area, EPH has requested, in its pleadings, a judgment against Molina in the

amount of the alleged payment deficiencies plus interest, fees and costs, as well as declaratory

judgment and injunctive relief to prevent Molina from underpaying in the future.  *See* Pl.'s Orig.

Pet. ¶¶ 22-32.

This dispute about emergency outpatient services reimbursement rates stems from the

following circumstances:  MCO plans generally require patients to seek medical services from

contracted ("in-network") physicians and hospitals, who have privately agreed, in advance, to

accept certain payment levels and reimbursement procedures from the insurer for the furnished

services.  *See* EPH Mot. 2; *see also* Molina Mot. 2-3; N.M. ADMIN. CODE § 8.311.2.11(C).  Such

agreements would, logically, greatly reduce the opportunity for disputes over regulatory payment

rates.  The rules governing New Mexico Medicaid, however, provide that patients may go to any

in-network *or* out-of-network hospital in an emergency situation and have the MCO pay for that

care.  *See* N.M. ADMIN. CODE § 8.305.7.11(F).  Another rule provides that when a facility is out-

of-network and has no rate-setting contract with the insurer, the payment owed by the insurer is

equal to that paid by the state[1] to the facility for the same type of care given to Medicaid

---

[1]	The Court understands this requirement as referring to the
amount the state is obligated to pay under the relevant
regulations and program rules.  *See* Molina Mot. Ex. A ("New
Mexico Provider Participation Agreement" or "Provider
Agreement") § 1.15 (stating that providers agree to be
reimbursed for services provided to Medicaid patients "in
accord with the reimbursement structure in effect" at the time

beneficiaries whose care is paid for directly by the state. *See* N.M. ADMIN. CODE

§ 8.311.2.11(C)(2). As there is no private rate-setting contract between EPH and Molina, and as

Molina patients have allegedly been regularly obtaining emergency care at the Hospitals, the

dispute principally concerns the definition and calculation of this "default" government-set

reimbursement rate. *See* EPH Mot. 2; *see also* Molina Mot. 4. The parties also dispute whether

the causes of action cited by EPH in its Original Petition actually provide standing to sue and/or a

basis for private recovery of amounts due under the regulatory reimbursement rate. *See* Molina

Mot. 5-6, 13-17; *see also* EPH Resp. 9-10.

     Molina seeks summary judgment in its favor, denying EPH any monetary recovery or

declaratory and injunctive relief. It argues, first, that it is subject to no privately enforceable

obligation to pay, and second, that if it is subject to such an obligation, it has fully discharged it

by making certain payments to EPH in the past – payments smaller than what EPH deems correct.

*See generally* Molina Mot.; *see also* Aff. of Julie Perez ("Perez Aff.") (Doc. No. 40-3) ¶ 8

(hospital official acknowledging that Molina made some payments to EPH).

     EPH, by contrast, only seeks partial summary judgment. It moves for the Court to hold

that the rate of payment or method for calculating payment, under the regulations, is a certain

simpler and more generous formula, rather than the more complex and less-generous one favored

by Molina. *See generally* EPH Mot.[2] The precise amount owed under any such formula cannot

be ascertained by the Court at this time because specific evidence concerning each outstanding

---

the service is rendered).

[2]    EPH's overall position calls for the recognition of a binding
and enforceable obligation to pay, but EPH never explicitly
asks for summary judgment on this point. *See generally* EPH.
Mot.; *see also generally* EPH Resp.

claim for each service performed has not been placed before the Court – and EPH does not request that the Court make such a specific finding at this time. While EPH has brought affidavit evidence showing that the alleged payment deficiencies under its formula total at least $3,400,000, and Molina does not bring evidence to dispute this calculation, EPH has not asked the Court to enter a final judgment in that amount at this time. *See* Perez Aff. ¶ 8; *see also* EPH Mot. 1-2. As these cross motions deal with essentially the same issues and arguments, though differing somewhat in the scope of requested relief, they are discussed here together.

II.     **DISCUSSION:**

  A.     **Standard of Review**

Summary judgment is required "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Warfield v. Byron*, 436 F.3d 551, 557 (5th Cir. 2006). The substantive law identifies which facts are material. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Ellison v. Software Spectrum, Inc.*, 85 F.3d 187, 189 (5th Cir. 1996). A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *Ellison*, 85 F.3d at 189.

"[The] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323; *Wallace v. Texas Tech. Univ.*, 80 F.3d 1042, 1046-47 (5th Cir. 1996). If the

moving party meets its initial burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). The nonmovant's burden may not be satisfied by "conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Warfield*, 436 F.3d at 557 (quoting *Freeman v. Texas Dep't of Crim. Justice*, 369 F.3d 854, 860 (5th Cir. 2004)). Factual controversies are to be resolved in favor of the nonmovant, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). Thus, the ultimate inquiry in a summary judgment motion is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

B.     **Obligation to Pay**

EPH asserts three distinct legal theories on which they are entitled to receive payment from Molina and to sue if payment is not forthcoming: (1) contract, (2) quantum meruit and (3) regulatory rates. *See* Pl.'s Orig. Compl. ¶¶ 11-21. Molina argues in response that none of these theories supports a legally-enforceable obligation, on its part, to pay the hospitals, and that it is entitled to summary judgment on that point. *See* Molina Mot. 5, 13-18. The nature of the briefing and the submitted evidence, however, reveal that resolving this question is not a simple task and is not feasible at this time; the Court cannot now state whether some or all of EPH's theories conclusively support an obligation to pay and standing to sue on such an obligation. At the same time, the evidence is such that the Court cannot accept Molina's proposition that there is no obligation to pay, and no standing to sue, under any of EPH's three theories. At the very least, Molina's history of paying EPH at least some amount for these claims suggests that it has

recognized some obligation to pay – though this simple course of conduct is hardly conclusive. *See* Perez Aff. ¶ 8.  Accordingly, the Court disagrees with Molina's contention that there is no binding and enforceable obligation to pay, and therefore the Court reserves the issue for trial.  In the subsections that follow, each of EPH's three alternative causes of action will be discussed, in order to more fully explain why genuine issues of material fact continue to exist, which require these issues to be decided at trial.

### 1. Contract

EPH pleads that Molina is obligated to pay it for emergency outpatient services under a contract law theory.  *See* Pl.'s Orig. Pet. ¶¶ 17-21.  Specifically, EPH contends that Molina and its plan members entered into contracts which, *inter alia*, required Molina to pay for their emergency care, and that these plan members validly assigned these rights to the Hospitals at the time they sought treatment.  *See id.* ¶¶ 19-21; *see also* Conditions of Admis. ¶ 3 (Doc. No. 46 Ex. P9) (example of an assignment of insurance benefits from a patient to one of the Hospitals).  EPH concludes this point by arguing that, as the assignee of these rights, it is in a position to sue Molina for any breach of its obligations.  *See id.* ¶ 21.

Molina points out that EPH has yet to furnish any evidence as to the existence of or terms of such member contracts.  *See* Molina Mot. 15-16.  This objection is well taken, to the extent that the lack of such evidence precludes the Court from holding, on summary judgment, that there is no issue of material fact as to the existence or terms these contracts and that EPH should prevail as a matter of law.  Clearly, EPH must prove that these contracts exist, and must demonstrate their contents, before judgment can be entered in its favor on such a theory.  But by the same token, Molina has not brought evidence tending to show affirmatively that such

contracts do not exist, or that their terms would preclude EPH's claims under them. Rather,

given what is before the Court, including both Molina's history of making past payments and the

standard industry practice of insurers having patient contracts with assignable and enforceable

rights, the most that can be said is that there is some likelihood that some relevant contracts do

exist. *See* Perez Aff. ¶ 8 (past payments from Molina to EPH over these claims); *see also*

Conditions of Admission ¶¶ 2-3 (evidence that patients with insurance often have assignable

rights of reimbursement for services). This factual uncertainty over what the terms of these

contracts are – or whether they even exist – must be resolved against summary judgment, and

thus the issue must be deferred until trial.[3] *See Little*, 37 F.3d at 1075.

Molina further argues that, even if such member contracts are found to exist, the

purported assignments described above are void for lack of consideration, and thus, EPH has no

standing to sue over them. *See* Molina Mot. 16-17. This argument fails on two distinct grounds.

First, as a matter of hornbook law, contractual rights may be assigned gratuitously – such an

assignment is not void for lack of consideration, and the assignee has standing to sue to enforce

or protect those gratuitously obtained rights. *See* Restatement (Second) of Contracts § 332

("Restatement § 332"); *see also Univ. of Tex. Med. Branch v. Allan*, 777 S.W.2d 450, 453 (Tex.

---

[3]  It is entirely possible that individual contracts between Molina and plan beneficiaries do not in fact exist, but instead the relevant contract is one between Molina and the state of New Mexico, which retains Molina to run the managed care plan and puts the plan members in the position of being third party beneficiaries; *those* third party rights may then be assignable. *See* N.M. ADMIN. CODE § 8.305.3.10 (indicating that New Mexico's Human Services Department is to enter into master contracts with insurance companies to provide MCO plans to Medicaid beneficiaries). Such a scenario, though, is close enough in substance to the facts and theories put forward by EPH, in its pleadings, to be reasonably contemplated at this juncture or at trial.

Ct. App. 1989) (recognizing the validity of Restatement § 332 in Texas). The difference is that a gratuitous assignment may be revoked absent certain formalities in its granting, while a non-gratuitous one cannot. *See* Restatement § 332. This is what separates the two categories, not any question of the underlying validity of the assignment. Molina urges a contrary result, citing the "well known principle[] of contract law" that an "assignment is 'void if without valid consideration.' " Molina Mot. 16 (citing *Indep. E. Torpedo Co. v. Herrington*, 128 Tex. 17, 26 (1936)). Far from being "well known," this obscure, seventy-four year old result which flatly contradicts modern contract law cannot control in this case. Instead, the modern view clearly articulated in Restatement § 332, the overall validity of which was recognized in *Allan*, must be given precedence. *See Allan*, 777 S.W.2d at 453.

Second, the assignments in question here were not actually gratuitous; they were made as part of an equal, consideration-backed exchange. Molina states that the purported consideration furnished by the Hospitals in exchange for these assignments was emergency medical care and argues that such consideration is actually no consideration at all, under the pre-existing duty rule, because the Hospitals were obligated under federal law to treat emergency patients as they arrived without consideration of their ability to pay. *See* Molina Mot. 16-17 (citing JOSEPH CALAMARI, CONTRACTS § 4-9(a) (3d ed. 1987) for the pre-existing duty rule); *see also* 42 U.S.C. § 1395dd ("EMTALA") (requiring hospitals to treat arriving emergency patients without regard to ability to pay).

This argument is misplaced. EMTALA does not extinguish an emergency patient's obligation to pay for treatment under Texas law; rather, it only prohibits a hospital from turning away an emergency patient on the basis of ability to pay. *See* TEX. HEATH & SAFETY CODE

§ 773.092(a)(3) (stating that hospitals may use personal information to help collect unpaid emergency room bills); *see also* TEX. PROP. CODE § 55.001 *et seq.* (Hospital Lien Act).  Because the patients retained the obligation to pay for their emergency care, the Hospitals' agreement to accept lower-than-standard payment rates in return for third-party-payments, or the Hospitals' rendering services in carrying out the mechanics of filing claims and processing payments from third party payers, could easily provide the consideration necessary to support a contractually binding assignment of benefits.  *See* Conditions of Admis. ¶ 2 (stating that the hospital may accept a lower-than-standard payment amount if the patient is enrolled in an insurance or government benefit program, and that the hospital may, at its option, file payment claims directly with the payer,[4] which would relieve the patient of this clerical burden).  In cases where the hospital does not make these compromises or provide these processing services in connection with a patient's bill, the consideration arguably fails – but such is not the present circumstance.

EPH further argues that it most likely provided services beyond those required by EMTALA to the patients whose claims are at issue in this case, which would provide another reason why the assignments were not gratuitous.  *See* EPH Resp. 15-16.  To settle this issue conclusively would require more evidence than is before the Court at this time.  For the foregoing reasons, then, the assignments in question do not fail for being gratuitous, and Molina is not entitled to summary judgment on this point.

There is thus a genuine issue concerning the material fact of which contracts exist and

---

[4]     A patient's assignment of insurance payment rights is standard typical hospital practice.  While it may appear to conflict with N.M. STAT. § 27-2-21 ("Assistance granted under this act shall not be transferrable or assignable . . ."), the better view is that this practice is permitted by N.M. STAT. § 27-2-7(B) ("[P]rogram payments may be made . . . [directly] to the vendor of goods or services provided to the recipient.").

what their precise terms are. Molina is not entitled to summary judgment on the proposition that there is no possible contractual obligation for it to pay in this case, because the evidence, if anything, suggests that Molina possibly does have a contractual obligation to pay. EPH, in seeking only partial summary judgment, has not even asked the Court for a declaration, at this time, that it is indisputably owed payment by Molina under a contracts theory. Accordingly, this issue will be saved for trial.

### 2. Quantum meruit

EPH pleads, in the alternative, that Molina is obligated to pay it on a theory of quantum meruit. Pl.'s Orig. Pet. ¶¶ 11-13. Molina has asked for summary judgment declaring that no possible grounds for recovery exists under this theory. *See* Molina Mot. 13-15. Unlike the contracts theory, the Court finds that there are no disputes regarding any material *facts* that pertain to the essential elements of quantum meruit, but two major legal points remain. The first is whether, on the given facts, the hospitals can satisfy the four-prong test for quantum meruit under Texas state law. The second, which involves a peripheral fact question, is whether recovery under quantum meruit is blocked by the existence of an underlying contract which governs the relationship in question.

Regarding the first point, it is clear, based on the evidence on the record, that EPH has satisfied the four-prong test for quantum meruit; Molina is therefore not entitled to summary judgment against EPH on this point. The four prongs of quantum meruit are: (1) that valuable services were rendered; (2) for the person sought to be charged; (3) which were accepted, used and enjoyed by that person; (4) under circumstances that reasonably notified that person that the provider was expecting to be paid by that person. *Vortt Exploration Co. v. Chevron U.S.A., Inc.*,

787 S.W.2d 942, 944 (Tex. 1990). There is no reasonable dispute regarding prongs one and four; specifically, that the medical services provided were valuable, and that Molina knew the Hospitals were expecting to be paid by Molina for them. *See, e.g.,* EPH Mot. Ex. P1 ("Allen Dep.") 6:20-23, Sept. 10, 2009 (Molina official acknowledging that "we should offer noncontracted border hospitals" some amount of "reimbursement" for the services at issue).

There is some dispute concerning the middle two prongs, but in the final legal analysis they fall in favor of EPH. Molina argues that the medical services were provided to, and accepted by, the patients – not Molina. *See* Molina Mot. 14. This, Molina argues, defeats the elements of the services being provided "for the person charged," and acceptance or enjoyment by the person charged. *Id.* While it is true that the immediate beneficiaries of the medical services were the patients, and not Molina, that company *did* receive the benefit of having its obligations to its plan members, and to the state in the interests of plan members, discharged. *See* N.M. ADMIN. CODE § 8.305.7.9-11 (setting forth the medical services which a Medicaid MCO insurer has an obligation to cover). Molina describes this discharging-of-obligations benefit as "incidental," but the Court finds this benefit material, due to the aforementioned obligations. *See* Molina Mot. 14 (describing the discharge of obligations as an "incidental benefit"). Indeed, Molina's very reason for existence is to ensure that such services are provided to plan members; seeing this core obligation fulfilled is hardly incidental. *See* N.M. ADMIN. CODE § 8.305.1.7(M)(1) (defining a "Managed Care Organization" as an "organization licensed to manage, coordinate and assume financial risk on a capitated basis *for the delivery of specified services to enrolled members*") (emphasis added). If these obligations are not deemed material and central to the Medicaid managed care scheme, how is such a system supposed to function?

In sum, these discharges were furnished for the benefit of Molina, which enjoyed them and accepted them, and Molina even acknowledged as much when it tendered payment for them at a rate it deemed to be proper. Thus, prongs two and three have been fulfilled as well as one and four, even though Molina disputes this characterization of the facts.

One thing which could stand in the way of a quantum meruit claim is the existence of a contract which covers the relationship and obligations at issue in the claim, as Molina points out. *See Vortt Exploration*, 787 S.W.2d at 944; *see also* Molina Mot. 14-15. But Molina cannot eat its cake and then have it, too. Having previously argued that no contractual obligation exists which requires it to pay out-of-network hospitals for plan members' emergency care, Molina cannot then proceed to argue that a governing contract *does* exist, which would undercut a quantum meruit theory of obligation. *Compare* Molina Mot. 15-16 *with* Molina Mot. 14-15. Molina tries to split the difference by arguing that, on the one hand, no privity of contract exists between it and EPH, but on the other hand, outside contracts – like the ones between EPH and the state of New Mexico which set up the Hospitals as recognized Medicaid providers (but not as part of Molina's network) – are enough to "fairly distribute the risks among the parties involved" and cut off quantim meruit. Molina Mot. 15. But this Janus-headed argument misses the point. While these outside contracts might affect the reimbursement rates that EPH could reasonably expect under the circumstances, and thus affect the extent of Molina's obligation under quantum meruit, they cannot undercut the basic obligation to pay created by quantum meruit. That is, they cannot do so unless these contracts specifically govern the relationship and obligation to pay between Molina and EPH – which they do not, as Molina itself has argued. *See* Molina Mot. 14-15 (arguing that there is no contract that would require Molina to pay EPH).

The availability of quantum meruit rests on whether there are contracts that govern the relationship at issue here. While the parties have acknowledged that Molina and EPH have never executed a contract together, if EPH is the assignee of contract rights issued by Molina to its enrollees – as disputed by Molina and discussed above – then its recovery would proceed under those contracts and not quantum meruit. Thus, the resolution of this quantum meruit question must await trial, where the facts surrounding the related contract question can be ascertained. Accordingly, Molina is not entitled to a finding that, as a matter of law, EPH is not entitled to payment under the theory of quantum meruit.

### 3.    Recovery of regulatory rates

EPH also pleads that it is entitled to sue Molina for payment on a cause of action arising from the state regulations which govern the New Mexico Medicaid program. *See* Pl.'s Orig. Pet. ¶¶ 14-16. Molina argues that it is entitled to summary judgment declaring that EPH cannot recover under such a theory as a matter of law. Molina Mot. 5-6. While EPH's theory has some plausibility, it is not entirely clear, as a matter of law, whether the regulations at issue can be properly construed as implying a cause of action. To begin with, the Court observes that there is no *explicit* cause of action under the relevant New Mexico regulations or statutes; the rules direct insurers like Molina to pay, but provide no specific consequences for a failure to do so. *See, e.g.,* N.M. ADMIN. CODE § 8.305.7.11(F) ("Either provider type [i.e. in-network or out-of-network] shall be paid [by the MCO] for the provision of [emergency] services on a timely basis."). Other provisions in the rules allow the managing state agency to impose various sanctions and corrections on insurers who err, but such sections are silent as to private rights of action by aggrieved service providers seeking past-due reimbursements. *See, e.g.,* N.M. ADMIN. CODE

§ 8.305.3.11(B)(8) (stating that the Human Services Department may enforce contractual and regulatory requirements by imposing sanctions such as requiring plans of correction, imposing plans of correction, imposing monetary penalties, suspending new enrollment, allowing members to terminate enrollment, suspending the agreement, and the like).

To support the instant claim, the Court would have to find that the regulations *imply* a cause of action under New Mexico law. The next hurdle, which arises in this connection, is that there are apparently no New Mexico state cases which have considered this particular question and ruled on whether or not this regulation creates a private cause of action. Nevertheless, implying a cause of action under New Mexico law is not an impossible feat. The New Mexico state courts have emphasized that state common law is considerably more liberal in implying causes of action from legislative enactments when compared to the federal standard; state courts may look to legislation "solely to demonstrate what is public policy," which then forms the "predicate for a common-law cause of action." *Nat'l Trust v. City of Albuquerque*, 874 P.2d 798, 801 (N.M. Ct. App. 1994). A court can also use the first three factors in the federal case of *Cort v. Ash*, 422 U.S. 66 (1975), to help in this analysis, but it is not limited or bound by those factors. *Nat'l Trust*, 874 P.2d at 801.

Referring to the instant case, the regulatory language quoted above makes clear New Mexico public policy supports prompt payments from Medicaid MCOs to out-of-network emergency services providers. *See* N.M. ADMIN. CODE § 8.305.7.11(F). A suit between the provider and MCO insurer would appear to be the most direct way of carrying that policy into execution. Thus, under the "public policy" approach described in *National Trust*, New Mexico law would likely imply a private cause of action. 874 P.2d at 801. *See also Michaels v. Anglo*

-15-

*Am. Auto Auctions, Inc.*, 869 P.2d 279 (N.M. 1994) (recognizing an implied cause of action based on the public policy embodied in a statute that proscribed certain conduct but did not explicitly provide for a private cause of action to sue over said conduct).

Using the first three factors of *Cort v. Ash* would also support an implied cause of action here. Those factors concern whether (1) the legislation was enacted for the special benefit of a class of which the plaintiff is a member; (2) there is any indication of legislative intent, explicit or implicit, to create or deny a private remedy; (3) a private remedy would either frustrate or assist the underlying purpose of the legislative scheme. *Cort*, 422 U.S. at 78. In the instant case, factors (1) and (3) clearly favor an implied cause of action. The Hospitals are members of the protected "out-of-network" provider class, and a private suit for collection would seem clearly to assist the purpose of seeing that they get paid. Factor (2) is, at worst, neutral. Thus, the public policy test and the modified *Cort v. Ash* test together would both support an implied cause of action under New Mexico law.

One complicating factor is that the enactment upon which this cause of action would be based is a regulation promulgated by an agency, not a statute enacted by the legislature. New Mexico courts have expressed some uncertainty regarding whether agency regulations which seek *explicitly* to confer a private right of action are effective in doing so. *See Nat'l Trust*, 874 P.2d at 800-01. Inferring a common law cause of action from the policy embodied in a regulation may be yet another step into the unknown. In *National Trust*, the court found that, notwithstanding the regulation at issue, which purported to confer upon private parties the right to seek judicial enforcement of a historical landmarks preservation law, the underlying statutes standing alone (which were silent as to who had a right of action but clear that an action for injunction could be

used for enforcement) could support standing for private organizations and an implied private right of action. *Id.* That decision bracketed the question of how much weight courts should put on regulations, as opposed to legislation, when creating standing and causes of action. *Id.*

Here, the underlying legislation, as well as the regulations, do not have any language which contemplates private lawsuits. The most on-point language available is a statute which allows direct payments to service providers that provide goods and services to public-assistance recipients, and the regulation cited above, specifying in detail that out-of-network emergency hospitals are to be timely paid. *See* N.M. STAT. § 27-2-7(B) (stating the direct payments to service providers on behalf of pubic-assistance recipients are permitted); *see also* N.M. ADMIN. CODE § 8.305.7.11(F) (stating that hospitals are to be timely paid). Read together, that statute and regulation may fairly spell out a specific public policy in favor of timely and complete payments directly from Medicaid MCOs to out-of-network hospitals for emergency care rendered to Medicaid beneficiaries, which would support an implied right of action under the common law to collect such payments. But reaching this conclusion requires taking a number of seemingly-reasonable but uncharted steps into the common law of a neighboring state.

In this connection, Molina disputes that a cause of action may be implied from these statutes and regulations, arguing that there exists a blanket rule, under federal law, that health care providers do not have a right to sue under Medicare or Medicaid statutes. Molina Mot. 5-6. It cites a number of cases in an attempt to support this proposition. *See, e.g., Long Term Care Pharmacy Alliance v. Ferguson*, 362 F.3d 50 (1st Cir. 2004). But Molina's proposition is over-broad, and the cases Molina cites actually stand for a narrower proposition that is inapposite here. Specifically, those cases hold that health care providers do not have the right to sue the

government over a claim that the offered Medicare or Medicaid reimbursement rates are too low, seeking to have the court force the government to offer higher rates. *Id.* at 59. Courts have consistently held that these programs are a take-it-or-leave-it proposition. *Id.* Providers have no right to sue to force the government to sweeten the offer price – their only remedy is to "vote with their feet" and cease participating in Medicare or Medicaid programs, treating only patients who furnish non-governmental payment. *Id.* Those cited cases say nothing about the question of suing to collect money allegedly owed under the settled rate for work already done, or seeking a court's assistance to determine what the rate actually is, when the laws or regulations setting it forth are unclear or subject to dispute. Accordingly, there is no federal law standing in the way of the claims found in the instant suit and no federal law barring a cause of action from being implied under New Mexico public policy in this connection.

For the foregoing reasons, then, the Court finds that there is a possibility that an implied private right of action exists under the New Mexico Medicaid statutes and regulations which would entitle EPH to recover reimbursements owed to it. The Court, however, does not need to answer this question of sister-state law at the present time. Molina should not be granted summary judgment; rather, the entire issue of which theory or theories support a suit, and whether such an obligation is broad enough to support recovery on all the disputed claims referred to by EPH, or just a subset of them, should be decided at trial when sufficient evidence will be available to address all three theories.

### C.     Determining Reimbursement Rates

Much of the briefing and argument in the case has essentially assumed that Molina has

some obligation to pay the Hospitals for emergency services rendered to plan members,[5] and that

the real crux of the dispute is what the correct rate of payment is.

1.      **New Mexico regulatory rates apply**

Both parties have agreed that the applicable rates are derived from the New Mexico

Medicaid regulations, even though the services were rendered in El Paso, Texas.  *See* EPH Mot. 2

("[T]he parties agree that the regulatory default rate applicable to the outpatient services the

Hospitals provide Molina's enrollees is the same rate the State of New Mexico pay the Hospitals

for patients enrolled in the traditional New Mexico Medicaid program."); *see also* Molina Resp.

3; *see also* Allen Dep. 76:7-10 ("Q  [T]here's just a disagreement over what the regulation – how

you convert those words into numbers.  A  Sure.").  The best objective support for this shared

view is the fact that the Hospitals executed agreements with the New Mexico Medicaid

department specifying that, in exchange for the right to bill New Mexico Medicaid for the

treatment of program beneficiaries, the Hospitals agree that they will limit their prices and accept

"as payment in full the amount paid by [Medicaid] for services furnished to clients in accord with

the reimbursement structure in effect for the period during which the services are provided as per

the [department's] reimbursement policy."  Molina Mot. Ex. A ("New Mexico Provider

Participation Agreement" or "Provider Agreement") § 1.15.  Though Molina is a private MCO,

and most of the care it provides its plan members is furnished by providers who have privately

negotiated reimbursement rates, Molina essentially steps into the shoes of the New Mexico

---

[5]          Whether all the services performed by the Hospitals, billed to
Molina, and covered by the instant dispute are properly
classed in the allegedly reimbursable "emergency services"
category appears to be a question of great practical
importance, but it is one for which substantially no evidence
has been placed before the Court.  Accordingly, it is reserved
for trial.

Medicaid department when reimbursing out-of-network hospitals for emergency care. *See* EPH Mot. 2; *see also* N.M. ADMIN. CODE § 8.311.2.11(C)(2). Thus, it pays at rates determined by the regulations, as those are the rates under the agreements between the Hospitals and the state. *Id*.

The services currently disputed by the parties in this case are emergency services. *See* EPH Mot. 1; *see also* Molina Mot. 4. Emergency services are generally covered by Medicaid and usually reimbursed on an outpatient basis; every relevant regulation notes this. *See, e.g.,* 8 N.M. ADMIN. CODE § 4.MAD.721.75 (1995) ("Emergency services furnished by eligible providers are reimbursed at the outpatient rate."); *see also* N.M. ADMIN. CODE § 8.311.2.16(E)[6] ("An emergency service furnished by an eligible provider is reimbursed at the outpatient rate."); *see also* N.M. ADMIN. CODE § 8.305.7.11(F) ("Either provider type [i.e. in-network or out-of-network] shall be paid for the provision of [emergency] services on a timely basis."). The following therefore centers on the policies applicable to outpatient services reimbursement systems, as opposed to inpatient services reimbursement or other categories of reimbursement.

### 2. What are the outpatient rates?

As discussed above, both sides have agreed that, assuming there is an obligation to pay at all, the reimbursement rate would be the New Mexico regulatory rate for outpatient services. EPH has urged that this rate has been, and continues to be, 75.845% of billed charges,[7] and has

---

[6]  As discussed below, certain parts of the New Mexico Medicaid regulations have been re-written and renumbered in recent years but often retain much of the old structure and many of the old policies. Thus § 8.311.2.16 is the direct successor of § 4.MAD.721.75.

[7]  The rate mentioned in the relevant regulations, as discussed below, is actually 77%. It was reduced to 75.845% on July 1, 2004, due to state budgetary shortfalls. *See* N.M. Medical Assistance Program Manual Supplement 04-09 (June 14, 2009). These two numbers may be used interchangeably to refer to the same basic reimbursement method. This rate was further reduced to 50% on December 1, 2009, which was after

moved for summary judgment on this point. *See* EPH Mot. 3 ("[T]he regulations set the rate at 77% of charges, but the rate was reduced to 75.845%."). This means, that for all the services at issue, EPH claims payment at 75.845% of the Hospitals' published prices, no matter how high these prices are, or what relation they bear to costs. *See* EPH Reply 1. A number of outpatient services are reimbursed on a separate state-mandated fee schedule and have been carved out for present purposes. *See* EPH Mot. 3 ("[F]ee schedule services are not the subject of this Motion.").

Molina argues that 75.845% of billed charges is not the applicable outpatient reimbursement rate; rather, it argues, the correct reimbursement amount under the New Mexico regulations is based on the federally-defined Medicare allowable costs method, which reflects the actual costs incurred by the hospital in treating patients. *See* Molina Resp. 4-7. Molina goes on to argue that this method contemplates multiplying a hospital's billed price by its "cost-to-charge ratio," a concept defined below, in order to arrive at the proper final payment. *Id.* at 7. Molina has also moved for summary judgment on this question. *See* Molina Mot. 5-13.

For the reasons set forth below, the Court finds that EPH is not entitled to summary judgment on its view of the outpatient reimbursement rate. The regulations do not support the theory that it is entitled to 75.845% of billed charges as final payment. But the Court also finds that Molina is only entitled to partial summary judgment on this point. While it is correct in arguing that EPH is entitled to payment based on a Medicare allowable costs model, its interpretation of that model is incorrect and runs the risk of specifying a reimbursement amount that is unjustifiably low.

### 3. Two generations of two sets of regulations

the time frame in which the instant Motions were filed with the Court. *See* N.M. Medical Assistance Program Manual Supplement 09-09 (November 19, 2009).

The reason why these two parties have had such difficulty resolving the meaning of the outpatient reimbursement rate is that the regulations provide several different applicable outpatient rates; the correct choice depends on the circumstances. But even before delving into the exact provisions of these regulations, the Court notes that there exist, for present purposes, two important sets of regulations, each of which has gone through two major versions in recent years. One set of regulations, the old 8 N.M. ADMIN. CODE § 4.MAD.704, now codified at N.M. ADMIN. CODE § 8.302.4, is specifically focused on setting out rules for the participation of out-of-state medical providers in the New Mexico Medicaid program, and is most central to the instant case. The old version was effective starting February 1, 1995, until the new version superseded it on August 14, 2008. *See* 19 N.M. Reg. 739 (August 14, 2008). The other set of regulations, the old 8 N.M. ADMIN. CODE § 4.MAD.721, now codified at N.M. ADMIN. CODE § 8.311.2, is concerned with the rules for furnishing, and paying for, hospital services more generally. It mainly applies to reimbursement rates for in-state hospitals. The old version was also effective from February 1, 1995, while the revised version superseded it on January 1, 2009. *See* 20 N.M. Reg. 11 (January 15, 2009). The parties have gone to some effort to highlight this progression, but, after a close examination, the Court finds that the key policies at issue here have remained the same through all these revisions.

The revisions to the out-of-state regulations changed the wording somewhat, but this was intended, according to the published statements of the regulatory body, "to clarify regulatory language and accuracy with existing rules," and not as a major substantive shift in policy. *See* 19 N.M. Reg. 74 (March 14, 2008). Moreover, based on the three public comments made in connection with the hearing for the proposed changes, it is clear that none of the participants or observers understood the re-wording to be a major shift in policy. *See* 31 N.M. Human Serv.

Reg. No. 30 (July 14, 2008). Finally, the Medical Assistance Division Departmental

Memorandum commenting on the changes is also consonant with the view that the basic policies

at issue in this case did not change with the revision. *See* N.M. Human Serv. Dep't, Med.

Assistance Div., Dep't Memorandum MAD-MR 08-09 (May 22, 2008) ("Dep't Memo"). That

Memorandum *does* state that the new rules "expand access to . . . services [beneficiaries] may

need if they are traveling out of state or if their closest provider practices in a border area

community." *Id.* But, as discussed below, this does not appear to be referring to any change in

the basic definition of out-of-state and border area providers.[8] Rather, this language seems to be

highlighting two smaller expansions of coverage which are not of major concern here: (1) adding

two new services to those covered when delivered "out-of-state" and (2) removing psychosocial

rehabilitation services for juveniles from the list of services not covered when performed either

out-of-state or by a border area provider. *Compare* 8 N.M. ADMIN. CODE § 4.MAD.704.3-4 *with*

N.M. ADMIN. CODE § 8.302.12-13. The regulators, in the Register, have stated that they consider

the new language to be equivalent in meaning to the old language. 19 N.M. Reg. 74 (March 14,

2008). The Memorandum noted above characterizes small, self-contained changes, without

contradicting the broader notion that the new language is meant to be generally equivalent to the

"existing rules."

The one unaccounted-for major change between the old and new versions of the

regulations appears at N.M. ADMIN. CODE § 8.302.4.17 ("Reimbursement to an out-of-state or

border provider is made at the same rate as for an in-state provider . . . ."). As pertains to out-of-

state providers, this is a clear shift in policy from the previous version of the regulations, which

---

[8] These terms are defined and discussed more fully in the next section.

provided that out-of-state providers were to be reimbursed at a flat 77% of billed charges, and not at the same rate as in-state providers. *See* 8 N.M. ADMIN. CODE § 4.MAD.704.6(D). This change was even included in the first published proposal concerning the new version of the regulations. *See* 31 N.M. Human Serv. Reg. No. 6 (February 18, 2008). The Court cannot account for the fact that the regulators stated that the changes were not meant to be substantial, but seemingly were substantial in this one respect.

The revisions to the general hospital regulations do make major changes – they set out a new outpatient reimbursement system for future use, called the Outpatient Prospective Payment System (OPPS). *See* N.M. ADMIN. CODE § 8.311.2.15(D). But those regulations specifically require that certain federal approvals be obtained before that system takes effect on fee-for-service providers, such as the Hospitals. *Id.* There is no evidence that such approvals have been issued, and the few pieces of evidence on the subject positively suggest that they have not yet been issued, at least as of the filing of the instant Motions. *See, e.g.,* EPH Mot. Ex. P7 (New Mexico Human Services Department letter dated August 26, 2009, stating, *inter alia*, that there is no correspondence between New Mexico and the federal Center for Medicare and Medicaid Services on the subject of approvals for the OPPS change). Thus, the old version's system of reimbursement remains in place – for the time being – under the explicit terms of the new version. *See* N.M. ADMIN. CODE § 8.311.2.15(D)(4).

This consistency can also be observed by noting that the old version of the hospital services regulations states that, for outpatient services at in-state hospitals, "the amount paid by Medicaid . . . is determined under methods and procedures furnished for determining allowable payment for outpatient hospital services under Title XVIII (Medicare) . . . reduce[d] by three (3%) percent." 8 N.M. ADMIN. CODE § 4.MAD.721.64. The new version states that, pending

-24-

federal approval of OPPS, fee-for-service providers will be reimbursed "using the medicare allowable cost method, reducing medicare allowable costs by three percent (3%)." N.M. ADMIN. CODE § 8.211.2.15(D)(4). Because OPPS has yet to be approved, the old and new versions provide for substantially the same thing. Having explained why the Court believes that each major section of regulations should be read as having constant policies over time, the discussion turns to the details of each particular section – the out-of-state providers section, and the in-state hospital reimbursement section, to ascertain the rules and methodologies that apply to reimbursements of outpatient services to the El Paso area hospitals in this case.

### 4. "Out-of-State" and "Border Area" providers defined, reimbursed

The New Mexico Medicaid regulations recognize three geographical categories of medical service providers: In-state, border area, and out-of-state. "In-state" refers to providers who furnish services physically within New Mexico, no matter where their billing offices or corporate parent headquarters is located. *See* N.M. ADMIN. CODE §§ 8.302.4.9, 8.302.4.16. "Border area" providers are those who provide services in geographic locations that are out-of-state but within 100 miles of the New Mexico state line, excluding Mexico. *See* N.M. ADMIN. CODE § 8.302.4.9. "Out-of-state" providers are those who provide services within the United States but more than 100 miles from the New Mexico state line. *Id*. Medical centers in El Paso are thus border area providers, because they are well within 100 miles of the New Mexico line.

Since the August 2008 revisions, the regulations have stated that New Mexico Medicaid "pays for border area services to the same extent and subject to the same rules and requirements that such services are covered when provided within the state." N.M. ADMIN. CODE § 8.302.4.9; *see also* N.M. ADMIN. CODE § 8.302.4.17 ("Reimbursement to an out-of-state or border provider is made at the same rate as for an in-state provider. . . ."). These sections are the direct

successors to the old regulations on the same subject, 8 N.M. ADMIN CODE § 4.MAD.704,
discussed below. It is perfectly clear that, since the revision, border area providers are generally
approved to provide the same broad range of services as in-state providers and are to be paid on
the same basis as in-state providers.[9] How that in-state method works will be described in
subsequent sections. For now, the Court must address the fact that the older version of the same
regulation is less clear, making it the major source of legitimate disagreement in this case.
Though it has been established above that the older and newer versions of this regulation were
meant to have essentially the same meaning, this question is further addressed by a close reading
of the regulatory text at issue. An extensive extract from those regulations, codified at 8 N.M.
ADMIN. CODE § 4.MAD.704, is set forth below in order to better understand the structure and
context of the reimbursement provisions:

> **704 OUT-OF-STATE PROVIDERS:** The New Mexico medicaid program (medicaid)
> pays for services furnished by border providers and out-of-state
> providers in instances when the needed services are not available in the
> State of New Mexico or when recipients are traveling out-of-state and
> need medical attention.
>
> This section describes eligible providers, covered services, service
> limitations, and general reimbursement methodology.
>
> **704.1 Eligible Providers:** Out-of-state and border providers must be
> licensed and certified by their respective states to be considered
> eligible to provide services to New Mexico recipients. To be reimbursed
> for furnishing services to New Mexico Medicaid recipients, out-of-state
> or border providers must complete the New Mexico Medical Assistance
> Program Provider Participation Application and have the application

---

[9]     EPH acknowledges this regulation at one point, but in so doing
tries to avoid its plain meaning. *See* EPH Mot. 7 ("The most
reasonable interpretation of these regulations is that MAD
intended to pay border area hospitals, as a final rate, the
interim rate for in-state hospitals of 75.845% of charges.").
Replacing the word "interim" with its antonym, "final," hardly
seems to be a reasonable interpretive strategy. The regulation
here indicates that border area providers are to be
"reimbursed" at the same rate as in-state providers – not
finally-reimbursed at the interim rate. EPH's reading would
have the effect of turning the plain meaning of the regulation
on its head.

approved by the New Mexico Medical Assistance Division (MAD).

    (A) Out-of-state providers are those providers who render services in an are more than 100 miles from the New Mexico border (Mexico excluded).  Border providers, those providers located within 100 miles of the New Mexico border (Mexico excluded), are subject to the rules governing the provision of services for in-state providers.

    (B) The claim filing limit for out-of-state and border providers is 120 days.

**704.2 Provider Responsibilities:** . . .

\* \* \*

**704.3  Covered Services:** Medicaid covers medical services furnished by out-of-state providers only when:

\* \* \*

**70[4].4[10] Noncovered Services:** Services furnished by out-of-state and border providers are subject to the limitations and coverage restrictions which exist for other Medicaid services. . . . Medicaid does not cover the following specific services when furnished by an out-of-state and/or border provider:

    1.  Services furnished outside the boundaries of the United States;

    2.  Services furnished in out-of-state or border nursing facilities and intermediate care facilities for the mentally retarded, or outpatient rehabilitation services; and

\* \* \*

**704.5 Prior Approval and Utilization Review:** . . .

\* \* \*

**704.6 Reimbursement:** Out-of-state providers must submit claims for reimbursement on the claim form appropriate for the service type furnished to the recipient. . . . Once enrolled, providers receive billing instructions and other material from MAD for processing of claims.

Reimbursement for out-of-state providers is made at the lesser of the following:

    1. The provider's billed charge; or

    2. The MAD fee schedule for the specific services or procedure when performed by an in-state provider.

    (A) . . .

    (B) . . .

---

[10]    The original reads "705.4," which is clearly a typo.

```
(C) . . .

(D) Outpatient services furnished by out-of-state hospitals, not
subject to reimbursement limitations, are reimbursed at seventy-
seven percent (77%) of billed charges. All hospital billings must
reflect the hospital's usual and customary charges for the services
furnished.

(E) Out-of-state hospital emergency room claims must have the
emergency room report attached to the claim.
```

The key point of contention revolves around § 704.6(D), which is a reimbursement clause. EPH claims that the phrase "out-of-state hospitals," in that subsection, refers to all hospitals outside of the boundaries of New Mexico; that is, both "border area" and "out-of-state" hospitals, as defined in § 704.1(A), would be "out-of-state" for the purposes of being reimbursed under § 704.6(D). *See* EPH Mot. 4-5. If § 704.6(D) applies to the Hospitals, then they would indeed be entitled to a 77% of billed charges as their final payment, without regard to their underlying costs or what other insurers or government programs pay, at least for services rendered before the August 2008 revisions made it perfectly clear that *all providers* – out-of-state, border area or in-state – get paid in-state rates. *See* N.M. ADMIN. CODE § 8.302.4.17 ("Reimbursement to an out-of-state or border provider is made at the same rate as for an in-state provider . . . .").[11]

Molina contends that the phrase "out-of-state hospitals" in § 704.6(D) refers only to "out-of-state" hospitals as defined in 704.1(A), meaning hospitals more than 100 miles from the state line. *See* Molina Reply 3-4. As such, the Hospitals would not be reimbursed under the terms of

---

[11]      Now that payment rates are equalized, the remaining
distinction between border-area and out-of-state providers is
that the full range of medical services may be obtained at
border area providers, but only a more limited range of
services may be obtained at out-of-state providers. *Compare*
N.M. ADMIN. CODE § 8.302.4.9 ("[Medicaid] pays for border
area services to the same extent . . . that such services are
covered when provided within the state.") *with* N.M. ADMIN.
CODE § 8.302.4.12 (providing for more limited circumstances
in which "out-of-state" services are covered).

§ 704.6(D), because they are "border" hospitals and not "out-of-state" hospitals.  *See id.*  Molina

offers a different source for determining what the reimbursement rates for border area hospitals

should be.  It points to the provisions of § 704.1(A): "Border providers, those providers located

within 100 miles of the New Mexico border (Mexico excluded), are subject to the rules

governing the provision of services for in-state providers" and argues that the phrase "subject to

the rules governing the provision of services for in-state providers" means that border area

providers, among other things, are paid at the same rate as in-state providers.  Molina Resp. 3-4.

This may be supported if one holds that the "rules" mentioned in § 704.1(A) include the rules

covering all the subjects set out in the introductory text to § 704 – "[t]his section describes

eligible providers, covered services, service limitations, *and general reimbursement

methodology*" (emphasis added).  EPH does not accept this reading; it argues that the "rules"

referred to in § 704.1(A) are things like excluded services rules and licensing requirements, not

reimbursement methodologies.  *See* EPH Resp. 3-4.

Molina has the better of this argument.  As established above, the New Mexico Human

Services Department expressly considers the new, less ambiguous regulations on this subject as

equivalent to, and a mere clarification of, the older regulations on this subject.  Imputing the

current, clear meaning backward to the older, less clear language would instantly settle the

matter, and that is what the agency's understanding of the revisions it made to its own rules

would suggest.  *See Cont'l Cas. Co. v. Rivera*, 124 S.W.3d 705, 710 (Tex. Ct. App. 2003)

(holding that an administrative agency's interpretation of its own rules is "entitled to great weight

and deference" unless its construction is "plainly erroneous or inconsistent").[12]  However,

---

[12]     The Court adopts EPH's position that Texas precedent on the
subject of rules of statutory construction and deference to
agency interpretation of regulations is applicable to this case.
*See* EPH Mot. 6 n.2 (citing *Duncan v. Cessna Aircraft Co.*,

because the agency did not account for the shift in out-of-state reimbursement policy between the old and new versions of the regulations while proclaiming that the two versions were meant to be substantially equivalent, as discussed above, the force of the argument is weakened and the Court cannot rest its conclusion entirely on this point.

Regarding the textual argument, the Court observes that the language of the old regulations is clearly compatible with Molina's view. In fact, even without resort to the new regulations, reading the old regulations as specifying that border area and in-state providers are to be paid on the same basis is more natural than the position that border area and out-of-state providers are to be paid on the same basis. The old regulations, like the new ones, clearly define "out-of-state" as a term of art, meaning more than 100 miles from the state line. The authors of the old regulations also knew how to employ the distinction that they created: § 704.3 sets out which services are covered when "out-of-state providers" furnish them, while the succeeding section, § 704.4, defines which services are not covered when "furnished by out-of-state and border providers." 8 N.M. ADMIN. CODE §§ 4.MAD.704.3, 4.MAD.704.4. This shows that the regulation writers did not regard the term "out-of-state" as referring to any provider physically outside of New Mexico, because in such a case the term "border," used in § 704.4 alongside the term "out-of-state," would be superfluous – which is a disfavored result. *See Duarte v. Disanti*, 292 S.W.3d 733, 735 (Tex. Ct. App. 2009) (holding that courts should construe legislative language so that "no part" of the text is "rendered superfluous"). Thus, when New Mexico regulators extend a 77% reimbursement rate to "out-of-state" hospitals performing outpatient services, the Court holds that "border area" hospitals are not covered by this reimbursement rule. *See* 8 N.M. ADMIN. CODE § 4.MAD.704.6(D). Had the regulators intended to include "border

---

665 S.W.2d 414, 420 (Tex. 1984)).

area" hospitals in the 77% reimbursement rate category, the precise words "border area" would have appeared in § 704.6(D) – but they do not.[13]

These uses of the distinction, moreover, are consonant with the apparent reason behind the creation of the "border area" category. It appears that the intent of that category is to enable New Mexico Medicaid recipients to enjoy a large choice of healthcare options available near their homes, even if that means a short trip across a state line. *See* Dep't Memo (stating that the purpose of a recent rule revision was to "expand access to . . . services [beneficiaries] may need . . . if their closest provider practices in a border area community"). In light of this policy, the restrictive list of "out-of-state" covered services contained in § 704.3 makes sense only when applied to providers more than 100 miles from the state line. This is because applying a restrictive policy to both border-area and out-of-state hospitals would nullify the very purpose of the "border area" category, by *preventing* broad access to nearby providers in border areas.

By contrast, the restrictions contained in § 704.4, applicable to both "border area" and "out-of-state" providers, refer mainly to the list of services that are not covered even in-state, which is sensible – things that are categorically medically unnecessary, or otherwise deemed not worthy of coverage, are such no matter where they are done. The text of § 704.4 only subjects a few otherwise-covered items to the strict state-line rule – the out-of-U.S. restriction is set out

---

[13]        The pre-1995 version of this rule also reflects the distinction between out-of-state and border area providers while having *no* special reimbursement rule for out-of-state providers. Accordingly, the 1995 insertion of a 77% reimbursement clause for the benefit of "out-of-state" providers, at a time when the distinction between "border area" and "out-of-state" providers was already well established, further supports the view that the intent of this new clause was narrowly focused on "out-of-state" providers only, as distinct from border area providers. *See* MAD-RULE 303 (dated November 1, 1993, filed with the New Mexico State Records Center on March 10, 1994).

here, and nursing, outpatient rehabilitation and juvenile psychosocial rehabilitation services are restricted to in-state providers only.  *See* 8 N.M. ADMIN. CODE § 4.MAD.704.4.  It is worth noting that New Mexico relaxed the juvenile psychosocial rehabilitation services rule, creating a greater choice in providers by allowing payment for such services when rendered by border area providers, and not just in-state providers, at a point when fiscal and policy-making circumstances seemed to permit it.  *See* Dep't Memo.

Given the short list of services for which "out-of-state" providers would be paid, and the presumed infrequency with which such providers would be visited, it makes sense that New Mexico might have opted for an administratively simple reimbursement method, such as a fixed percentage of stated charges, even if that meant overpaying on occasion.  But, given that "border area" providers are meant to furnish the full range of services with some frequency (given their proximity to populations of New Mexicans), it would be reasonable that New Mexico would not choose a reimbursement system that was administratively simple but carried the risk of systematically making the wrong payment.  Instead, it is sensible to believe that New Mexico would formally opt to use the more complicated but more precise reimbursement methods used for in-state providers.  Indeed, as discussed above, this is exactly what the text of the regulations provide.

In support of its position that it should be reimbursed at 75.845% of billed charges at all relevant points, EPH submits some evidence which tends to show that the New Mexico Medicaid department, when paying claims directly, as opposed to through an MCO such as Molina, has been in the habit of reimbursing them at a rate of 75.845% of charges, without returning at the end of year for a cost settlement.  *See* EPH Mot. 6; *see also* Perez Aff. ¶¶ 6-7; *see also* Perez Aff. Ex. 1 (examples of claims made by the Hospitals for outpatient services and reimbursed by New

Mexico at 75.845% of billed charges). EPH goes on to argue that this course of conduct should

serve as evidence of how the Medicaid department interprets their own regulations, and that the

Court should defer to this implicit agency interpretation. *See* EPH Mot. 6. Molina responds that

this interpretation is unjustified and contradicted by other sources, and that these payments

should be viewed, consonant with Molina's own interpretation,[14] as mere interim payments that

are required by rule to be cost-settled at the end of each year – even if the agency has been lax in

making such settlements. *See* Molina Resp. 7-9.

EPH's reliance of this course of conduct seems misplaced. First, the mere act of paying

75.845% of billed charges as the bills are submitted is not, standing alone, evidence that New

Mexico intends to make final payments at that rate. This is because New Mexico's

implementation of a Medicare-based cost-settled reimbursement system, until recently, called for

interim payments of 75.845% of billed charges, pending a final, year-end settlement.[15] *See* 8

N.M. ADMIN. CODE § 4.MAD.721.64 ("For those services reimbursed under the Medicare

allowable cost method . . . [t]he interim rate of payment is seventy-seven (77%) percent of billed

charges."). Thus, because the bare fact of making these payments is compatible with both

interpretations, the only relevant actions in this context in support of EPH's position are actually

*inactions* – the fact that New Mexico has not asked the Hospitals for year-end cost settlements in

recent memory. *See* Perez Aff. ¶¶ 6-7 ("The State of New Mexico has never required nor

---

[14]           As noted above, Molina contends that border-area hospitals
are reimbursed for outpatient services on the same basis that
in-state hospitals are. As described in greater detail below, the
in-state reimbursement method calls for making interim
payments for services as they are rendered, and then settling
accounts at the end of each year; the final amount retained by a
hospital depends on its actual costs of providing the covered
services.

[15]           A more detailed discussion of the allowable-cost method, and
the role of interim payments in it, is set forth below.

requested a cost report from the Hospitals in order to receive this rate[.]").  In a subtle but important way, EPH has adopted an incorrect perspective on this issue.  Under the relevant regulations, EPH never needed to submit a cost report "in order" to receive 77% of billed charges as periodic payments, as the interim rate was fixed at that level by rule.  It only needed to submit cost reports "in order" to comply with any settlement request it might receive from the state government.  Thus, the tendering of 77% of billed charges is not, standing alone, proof of one interpretation or another.  But the habitual failure of New Mexico to request a cost settlement (or to punish EPH for failing to submit a report) arguably is.

Assuming that the New Mexico agency has no intention of cost-settling the charges, and regards these payments as final, this implicit interpretation of the regulations is contradicted by the unambiguous language of the regulations.  Most strikingly, the new version of the regulations is unambiguously clear that all hospitals are to be treated just like in-state hospitals for setting reimbursement rates.  *See* N.M. ADMIN. CODE § 8.302.4.17 (stating that both border area *and* out-of-state hospitals are to be reimbursed like in-state hospitals).  Yet, according to EPH, and in spite of this clear directive, the New Mexico agency has been paying post-August 2008 claims at 75.845% of billed charges (a rate that appears nowhere in the post-August 2008 regulations as a legitimate rate of *final* payment) and not cost settling at the end of the year.[16]  *See* 8 N.M. ADMIN.

---

[16]        The Court observes that there may be a perfectly sound practical reason why the agency is not strictly following these rules.  Given the policy of shifting the bulk of Medicaid recipients to MCOs, one may assume that few beneficiaries remain for which the state agency directly pays the claims.  *See* N.M. ADMIN. CODE §§ 8.301.5, 8.305.1-4 (setting out the policy of moving Medicaid beneficiaries to MCO plans).  As such, the agency might regard it as expedient to simply overpay the relatively small number of directly reimbursed claims coming from border area hospitals, similar to how the pre-August 2008 rules explicitly contemplate no cost settlements for truly infrequently visited "out-of-state" hospitals.  Taking losses on a small number of overpayments may be less costly, from the agency's point of view, than a

-34-

CODE § 4.MAD.721.64 (effective until January 1, 2009) (stating that 77% of billed charges is an *interim* rate of payment); *see also* Perez Aff. ¶¶ 6-7. The Court cannot place great weight on this agency habit. Given that it clearly does not conform with the regulations in the post-August 2008 situation, there is a serious risk that it was also erroneous in the pre-August 2008 situation as well. Instead, the written agency interpretations cited before, which point to a different conclusion, should be regarded as the true measure of the meaning of the regulations.

EPH also points to emails and other correspondence with state officials which it argues is binding written agency interpretation. *See* EPH Mot. 8. The most specific email sent by a state official and cited by EPH on this subject, which states that they are to be reimbursed for outpatient services at a flat rate of 75.845% of billed charges, is dated September 24, 2008. *See* EPH Mot. Ex. P5 ("Aufrichtig Email"). It reads, in part: "The regulations are not as specific on the outpatient side as they are for inpatient. The outpatient side is paid at a percentage of billed charges . . . [t]he outpatient rate is 75.845%." *Id.* If this is taken to mean that 75.845% of billed charges is the proper final rate of payment, this statement flatly contradicts the regulations cited above, which  – due to the repeal of 8 N.M. ADMIN. CODE § 4.MAD.704 on August 14, 2008 – contained no provisions in any relevant section specifying that a correct final reimbursement rate for any hospital anywhere was a simple 75.845% of billed charges.[17] An agency interpretation

---

major annual effort to cost-settle a large number of infrequently visited hospitals, when each cost settlement would only yield a small refund in favor of the state.

[17]    The Court observes that the New Mexico agency has memorialized, in a published document, the practice of paying "out-of-state" hospitals a fixed fraction of billed outpatient charges, without going back for an end-of-year cost settlement, in the post-August 2008 environment. *See* N.M. Medical Assistance Program Manual Supplement 09-09 at 2 (November 19, 2009) (referring to "out of state hospital facilities that are not cost settled"). As noted above, this cannot be reconciled with the plain language of the post-August 2008 regulations. Thus, it cannot be deemed an

may be authoritative in light of ambiguous regulations, but cannot flatly contradict clear ones, as this purported interpretation does.  *See Continental*, 124 S.W.3d at 710.

EPH also points to an email exchange between Rita Wood, of the New Mexico Human Services Department, and Lynn Allen of Molina, which purports to confirm that, as of the time of writing on November 1, 2007 (before the repeal of § 4.MAD.704 in 2008), the proper rate of final payment for outpatient services at the Hospitals was 77% of charges.  *See* EPH Mot. Ex. P12. But, in that exchange, the question of outpatient rates was clearly secondary to other questions concerning inpatient reimbursements, "outlier cases," and "DRG rates," which makes it difficult to place too much weight on this exchange as a thoughtful interpretation of outpatient regulations.  *See id*.  Moreover, it is not clear whether Lynn Allen's question, and Rita Wood's response, concerned interim or final outpatient reimbursement rates at the text only speaks of reimbursement, without specifying interim or final.  *Id*.  Accordingly, these interpretations carry little weight when viewed against the other interpretive resources available on this subject.

There are, in conclusion, several reasons why the pre-August 2008 regulations should be read as providing that the El Paso hospitals are reimbursed for outpatient emergency services at the New Mexico in-state rate, and not at a flat 77% of stated charges.  First, the new version of the regulations makes clear that the in-state rate is to be used for border area providers, and the history of the transition shows that the administrative agency considers the old language to mean the same thing as the new language.  Second, the language of the old regulations, with its explicit definition of "out-of-state" versus "border area" providers, and its demonstrated ability to wield these terms of art with intent and precision, suggests that the absence of the phrase "border area"

interpretation of them.  Instead, the Court must also view this
as reflecting the practice of discretionarily waiving regulatory
cost settlements in order to avoid uneconomical transaction
costs.

from § 704.6(D) is meant to exclude intentionally such providers from the 77% final reimbursement rate.  Third, the policies which appear to lie behind the adoption of the "out-of-state" and "border area" definitions show that the distinctions made in the old regulations are logical, including the distinction between the two categories for the purposes of reimbursement. Moreover, EPH's attempts to show that the agency had a binding interpretation of the regulations, which specifies a contrary result, are unpersuasive.

The bottom line is that, prior to August 14, 2008, only "out-of-state" hospitals, and not "border area" ones, were entitled to 77% of billed charges as final payment.  After August 14, 2008, no hospital anywhere was *entitled* to such a final payment, even if the state agency has been waiving cost settlements on the claims it pays directly and allowing some hospitals to pocket a windfall.  The Court therefore holds that at no time frame at issue in this litigation was Molina obligated to make final payment to the Hospitals at 77% of stated charges for emergency outpatient care.  Rather, Molina was always obligated to reimburse them at the in-state rate.

### 5.  The in-state rate – Medicare allowed charges minus 3%

Having established that Molina was always obligated to reimburse the Hospitals at the in-state rate for covered emergency outpatient services, the Court will address the question of what that rate is, or at least the definition or methodology behind setting the rate.  This starts with the relevant regulations, which, as noted above, have gone through two major versions.  The old regulation provided:

> **721.64 Reimbursement for Outpatient Services** For outpatient hospital services furnished by approved Title XIX (Medicaid) hospitals for Medicaid reimbursement purposes, the amount paid by Medicaid through its fiscal agent for services furnished to recipients and covered under Medicaid, the manner of payment and the manner of settlement of overpayments and underpayment is determined under the methods and procedures furnished for determining allowable payment for outpatient hospital services under Title XVIII (Medicare) of the Social Security Act.
>
> For those services reimbursed under the Medicare allowable cost

method, Medicaid reduces the Medicare allowable costs by three (3%) percent. The interim rate of payment is seventy-seven (77%) percent of billed charges. These provisions are applicable to all hospitals approved for participation as Title XIX hospitals in the Medicaid program.

    (A)    In no case can reimbursement for outpatient hospital services exceed reasonable costs as defined by Medicare, either for hospital or physician claims. Laboratory services cannot exceed maximum levels established by Medicare.

    (B)    Reimbursement for oral medications dispensed in a hospital outpatient setting is limited to usual charges up to a maximum of two ($2.00) dollars per visit per Medicaid recipient.

    (C)    For services which are usually furnished in a physician's office, as defined by Medicare, an outpatient clinic facility charge or urgent care facility charge can be billed only if it is approved by Medicare regulations.

            A provider must notify MAD when he/she is approved by Medicare to bill outpatient clinic or urgent care facility fees. The corresponding hospital based physician charge is subject to reimbursement limitations. See Section MAD-711.7, MEDICAL SERVICE PROVIDERS.

    (D)    Services or supplies furnished by a provider under contract or through referral must meet the contract services requirements and be reimbursed based on certain methods. See Section MAD-702, BILLING FOR MEDICAID SERVICES.

8 N.M. Admin Code § 4.MAD.721.64.

The new regulations similarly provide:

**D. Reimbursement for outpatient services:** Effective January 1, 2009, outpatient hospital services are reimbursed using outpatient prospective payment system rates.

    (1) Reimbursement for laboratory and radiology services will not exceed maximum levels established by MAD.

    (2) Reimbursement for oral medications dispensed in a hospital outpatient setting is limited to usual charges up to a maximum of two dollars per visit per eligible recipient.

    (3) Services for supplies furnished by a provider under contract or through referral must meet the contract services requirements and be reimbursed based on approved methods. See 8.302.2. NMAC, *Billing For Medicaid Service*

    (4) For MAD fee-for-service (FFS) contracted providers only, when applicable due to federal requirements, the OPPS rates will be implemented following approval of the New Mexico state plan by the centers for medicare and medicaid services (CMS). Until implemented, reimbursement for a MAD fee-for-service provider will be made using the medicare allowable cost method, reducing medicare allowable costs by three percent (3%). The interim rate of payment

is established by MAD.

N.M. ADMIN. CODE § 8.211.2.15(D).

The essential provision in the old version is: "For outpatient hospital services . . . the amount paid by Medicaid . . . is determined under the methods and procedures furnished for determining allowable payment for outpatient hospital services under Title XVIII (Medicare) of the Social Security Act." This is subject to the following modification: "For those services reimbursed under the Medicare allowable cost method, Medicaid reduces the Medicare allowable costs by three (3%) percent." The new version provides for substantially the same result: "Until [the new OPPS rates are] implemented, reimbursement for a MAD fee-for-service provider will be made using the medicare allowable cost method, reducing medicare allowable costs by three percent (3%)." Having established above that border area hospitals are reimbursed for emergency outpatient services in a manner akin to in-state hospitals, it is clear that a cost-settled system modeled on the Medicare system applies to the Hospitals in this case.

In this Medicare model, reimbursement amounts are keyed to the actual costs incurred by a hospital in providing covered care. *See generally* 42 C.F.R. § 413.5 ("[P]ayment is to be made on the basis of current costs of the individual provider, rather than costs of a past period or a fixed negotiated rate."). These costs are determined annually, in retrospect, through a review of the hospital's financial statements and cost reports. *See generally id.* §§ 413.9(b), 413.20. The audit tallies the hospital's actual and allowable costs of providing services, department by department, and then, using the hospital's billing records, determines the fraction of those services provided by each department to Medicare patients. *See generally id.* §§ 413.24, 413.50, 413.53. Then, for each department, the audit multiplies the fraction of services provided to Medicare patients by the total departmental costs, and the government reimburses the hospital that amount – the total share of departmental costs incurred in the course of treating government-

sponsored Medicare patients. *See id.* §§ 413.50(b) ("[T]he program's payments to providers

should be such that the costs of covered services for beneficiaries would not be passed on to non-

beneficiaries, nor would the cost of services for non-beneficiaries be borne by the program."),

413.53(a).

This audit can also be used to determine a hospital's "cost-to-charge" ratio. *Id.*; *see also*

*id.* § 413.60. By using billing records, the auditor can determine the total nominal charges that

the hospital billed for all covered services. This total of charges for all covered services is then

compared to the auditor-determined total actual costs for these covered services, and, using long

division, a cost-to-charge ratio is determined. *See id.* §§ 413.60, 413.64. Thus, a cost-to-charge

ratio of 33% means that, on average, the cost of services is just one third of what the hospital

seeks to bill for its services.

Because a final cost-based payment amount can only be determined retrospectively

through a year-end audit, a payment system that employs such a principle usually calls for the

payment provider to advance interim payments for services as they are rendered. *See id.*

§ 413.64(f) ("Actual costs reimbursable to a provider cannot be determined until the cost reports

are filed and costs are verified."). In the federal Medicare system, the amount of these interim

payments is often based on previous years' cost-to-charge ratios. *See generally id.* § 413.64.

That ratio is multiplied by the amount of each newly submitted bill to determine how much cash

is actually paid to the hospital on an interim basis.[18] *Id.* After cost reports are submitted and a

---

[18]      It appears that New Mexico has only recently shifted to the practice of basing interim reimbursement rates for in-state hospitals on previous years' cost-to-charge ratios. It had long used a constant, arbitrary interim rate of 77% of billed charges, subject to end-of-year cost settlement. *See* N.M. Med. Assistance Program Manual Supp. 09-09 at 2 (November 19, 2009) ("Supp. 09-09"). That Supplement also made clear the fact that the interim payment rate for cost-settled hospitals, and the final payment rate for out-of-state non-cost-settled

final payment amount is determined, it is compared to the total interim payments already made, and an additional payment, or a refund, is made as necessary.  *See id.* § 413.64(a) ("A retroactive adjustment based on actual costs will be made at the end of the reporting period.").  Regarding the Hospitals at issue in this case, the evidence shows that the cost to charge ratios have been approximately 10%-15% over the past several years.  *See* Molina Mot. Ex. D ("Consultant Report") 14, 20.

But the Court cannot go any further, or even as far as Molina asks.  Establishing the exact amount owing, or even a precise formula for calculating the amount owing, is not possible given the evidence currently before the Court.  Even though there is some evidence regarding the overall cost-to-charge ratios for the years at issue, it would be a mistake to simply apply each year's cost-to-charge ratios to the disputed bills issued in that year.  This is because the cost-to-charge ratios reported here reflects the total of all costs of covered services across the entire hospital divided by the total amount billed for these services.  *See* XUE SONG & BARRY FRIEDMAN, U.S. DEP'T OF HEALTH AND HUMAN SERVICES, CALCULATE COST ADJUSTMENT FACTORS BY APR-DRG AND CCS USING SELECTED STATES WITH DETAILED CHARGES 1 (Agency

---

hospitals had been deliberately set to the same percentage in the past (77%, then 75.845%), but that this correspondence was being loosened by setting interim rates for cost-settled hospitals based on past cost-to-charge ratios (when available) instead of an arbitrary number.  *Id.*  Only cost-settled providers who do not have enough relevant past information on file will still reflect the peg – their interim rate of 50% will mimic the final 50% rate paid to non-cost-settled hospitals.  The Court must thus observe that until recently Molina was required to make *interim* payments to EPH not using the cost-to-charge method, but at 77% of billed charges.  To the extent Molina did not do so, however, it is unclear what damages the Hospitals actually suffered as a result, because any difference between the interim payments and the amounts actually due under the cost-based system were to have been paid up or refunded (with interest) at the end of each year.  Thus, the essential point for assessing damages for claims related to past years is the amount Molina actually owed as final payments.

for Healthcare Research and Quality, HCUP Methods Series Report 2008-04, 2008) ("HHS Report") (observing that the typically calculated cost-to-charge ratios are "hospital wide")[19]; *see also* Consultant Report 20 (showing cost-to-charge ratios on a hospital-wide basis).  Any particular department or procedure may have its own cost to charge ratio which differs from other hospital departments and the hospital's average.  *See* HHS Report 1 (observing that hospital-wide cost-to-charge ratios are subject to "systematic bias" because they do not account for differences in markup between different categories of services, and that corrective methods must be used if cost-to-charge ratios are to be used to estimate the costs associated with any given type of procedure or condition).

This is why, under the traditional federal Medicare procedures, multiplying each bill by a cost-to-charge ratio is only the basis for determining *interim* payments, while the final settlement relies on a finer grained analysis of a hospitals costs and billings, done on a department-by-department basis.  That sort of exercise is needed to answer the question of the amount owed here.  This problem may be illustrated by observing that, in the instant case, there is some evidence showing that the overall cost-to-charge ratios for the Hospitals tended to be in the 10%-15% range for the years in question, but that the *outpatient* cost to charge ratio has at least sometimes been 55.54%.  *See* Consultant Report 14, 20 (stating the cost-to-charge ratios for the Hospitals); *see also* EPH Mot. Ex. P12 (stating the outpatient cost to charge ratio as 55.54%).  Such a wide discrepancy emphasizes the fact that the cost-settlement system is not amenable to easy short-cuts, and that the only way to ascertain the true amount owing under the regulations is

---

[19]     The Court takes judicial notice of this Executive Branch report prepared by the Department of Health and Human Services. *See Shehu v. Gonzales*, 443 F.3d 435, 437 (5th Cir. 2006) (taking judicial notice of certain State Department Country Reports).

the actual cost-audit contemplated by the regulations.

At this point, there is insufficient evidence to support the conclusion that the Court can simply multiply any of the cost-to-charge ratio figures proffered by Molina by each submitted bill amount to determine the total amount owing. If anything, the evidence points distinctly in the opposite direction. Accordingly, while Molina is entitled to a summary judgment on the point that it is required to pay EPH using a cost-based method, it is not entitled to a grant of summary judgment which approves of the way in which it intends to implement such a method. Instead, the actual application of the cost-based method to the Hospitals' accounting data and submitted charges must be dealt with at trial.

### 6. Conclusion regarding applicable rates

It is clear that the New Mexico Medicaid regulations call for reimbursement to EPH under a cost-based system, as the Hospitals are "border area" hospitals, and border area hospitals are reimbursed as if they are "in-state" hospitals, and in-state hospitals are reimbursed on an allowable-cost system for the time frames at issue here. At trial, the parties will have to adduce evidence which properly applies the allowable-cost method to all of the individual claims at issue in this suit, so that a gross amount due for the services at issue may be calculated. They will also have to furnish evidence regarding past interim payments made by Molina to EPH in order to ascertain a net amount owed.

## III. CONCLUSION:

For the reasons discussed above, EPH's Motion for Partial Summary Judgment is **DENIED**. Molina's Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part. Specifically, Molina's request for summary judgment in its favor, on the grounds that none of the causes of action cited by EPH could support an obligation to pay the bills in question, is

**DENIED**.  Molina's request for summary judgment in its favor on the question of what is the rate of payment is **GRANTED** in part and **DENIED** in part.  It is **GRANTED** as to the following points:  (1) That New Mexico regulations govern the payments at issue in this case, and (2) that those regulations require the use of a system derived from the Medicare allowable costs method for determining the amounts owed for the services at issue in this case.  It is **DENIED** as to all other points.

　　　　**SO ORDERED**.

　　　　**SIGNED** on this 21st day of January, 2010.

KATHLEEN CARDONE
UNITED STATES DISTRICT JUDGE